ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeals of -- ) | |
| ) | |
| L.C. Gaskins Construction Co., Inc. ) | ASBCA Nos. 58550, 59901, 59902 |
| ) | |
| Under Contract No. N69450-09-C-5068 ) | |

APPEARANCES FOR THE APPELLANT: Dirk D. Haire, Esq.
Alexa Santora, Esq.
  Fox Rothschild LLP
  Washington, DC

APPEARANCES FOR THE GOVERNMENT: Ronald J. Borro, Esq.
  Navy Chief Trial Attorney
Ellen M. Evans, Esq.
David M. Marquez, Esq.
  Senior Trial Attorneys

## OPINION BY ADMINISTRATIVE JUDGE THRASHER
## ON THE GOVERNMENT'S MOTION FOR RECONSIDERATION

The government timely moves for reconsideration in part of our entitlement decision of 9 June 2017. *L.C. Gaskins Construction Co., Inc.*, ASBCA No. 58550 *et al.*, 17-1 BCA ¶ 36,780. The government requests the Board reconsider our entitlement decision, modify the decision to deny appellant's claims and sustain the government's claim for liquidated damages. We assume familiarity with our 9 June 2017 decision.

## DISCUSSION

The Board recently reiterated our reconsideration criteria:

> In a motion for reconsideration, the moving party has the burden of "demonstrat[ing] a compelling reason for the Board to modify its decision." *ADT Construction Group, Inc.*, ASBCA No. 55358, 14-1 BCA ¶ 35,508 at 174,041 (citations omitted). In particular, it must provide newly discovered evidence or demonstrate mistakes in the original decision's findings of fact or conclusions of law. *Id.* A motion for reconsideration is not the place to present arguments previously made and rejected. "[W]here litigants have once battled for the court's decision, they

should neither be required, nor without good reason permitted, to battle for it again. Motions for reconsideration do not afford litigants the opportunity to take a "second bite at the apple" or to advance arguments that properly should have been presented in an earlier proceeding." *Dixon v. Shinseki*, 741 F.3d 1367, 1378 (Fed. Cir. 2014) (citations omitted); *see also Avant Assessment, LLC*, ASBCA No. 58867, 15-1 BCA ¶ 36,137 at 176,383.

*Supply & Service Team GmbH*, ASBCA No. 59630, 17-1 BCA ¶ 36,742 at 179,097.

The government's motion asserts six grounds for reconsideration and requests clarification on two issues. We will address each in turn.

1.  Board's Ruling on Gaskins' Entitlement to 25 Days of Compensatory Delay Related to the Multiple Containment Request Resulting in Mod. P00009

Our findings established that bilateral Mod. P00009 granted Gaskins a 50-calendar-day extension related to the review and approval of Gaskins' request to construct additional containments on the hangar roof. It did not grant any compensation for the delay but Gaskins, in executing the Mod., reserved the right to claim for more time and money. (Findings 102-03)[1] Gaskins ultimately only sought compensation for the 50-day delay granted in Mod. P00009 (compl. ¶ 117). The government asserts five reasons why we should reconsider our decision on this issue:

> First, the statement that the Navy's expert, Mr. Heckman, "*did not analyze this issue*" is incorrect. Second, Mr. Lowe conceded at trial that his finding of 25 days of compensable delay was not tied to *any* actual analysis. Third, Mr. Lowe did not analyze contractor delays during the time period in question. Fourth, there is no objective evidence that supports Mr. Lowe's assumption that Gaskins would have added containments in the fall of 2010 if it had been allowed to do so by October 5, 2010. And finally, by considering the time extension in modification P00009 as an admission of government fault, the board followed the "presumption" set out in *Robert McMullan & Son, Inc.,* ASBCA No. 19023, 76-1 BCA ¶ 11,728 at 55,903, which was specifically overruled

---

[1] Record citations are from the Board's 9 June 2017 decision.

in *England v. Sherman R. Smoot Corp,* 388 F.3d 844, 857
(Fed. Cir. 2004) (government's grant of a contract
extension does not indicate government at fault).

(Gov't mot. at 1-2)

A compensable delay is one for which both a time extension and monetary relief are due and an excusable delay is one for which only a time extension is due. *M.E.S., Inc.,* ASBCA No. 56149 *et al.,* 12-1 BCA ¶ 34,958 at 171,857 n.3. In order to prove that it is entitled to delay damages in the form of time and/or money, Gaskins must prove that the government was responsible for specific delays, overall project completion was delayed as a result of the government-caused delays, and any government-caused delays were not concurrent with delays within Gaskins' control. *Versar, Inc.,* ASBCA No. 56857 *et al.,* 12-1 BCA ¶ 35,025 at 172,128. Proof of damage is also an element of entitlement and, while mathematical certainty is not required, some proof of damage is required. *BAE Systems San Francisco Ship Repair,* ASBCA Nos. 58810, 59642, 16-1 BCA ¶ 36,404 at 177,503; *Lear Siegler Services, Inc.,* ASBCA No. 57264, 12-2 BCA ¶ 35,112 at 172,425.

*Mr. Heckman's Analysis and Mr. Lowe's Failure to Consider Concurrent Delay*

The government attacks the basis for Mod. P00009 arguing it was a mistake for which there is no objective factual support in the record (gov't mot. at 9-12). Mod. P00009 was a bilateral modification executed by the contracting officer, Ms. Eckert. The government argues:

> Ms. Eckert, testified there was no schedule analysis to support the time extension in this modification, but that she relied in signing it on a prior ACO's representation that 50 days of excusable delay had been agreed upon with Gaskins. She testified she disagreed with the time extension in this modification because she later learned Gaskins had failed to provide necessary information to the Navy during this 50-day time period. Tr. 8/108-112.

(Gov't mot. at 12) Despite her testimony, the fact remains that Ms. Eckert signed the bilateral modification and there is no indication she lacked the authority to bind the government or other facts that would support a finding of mistake that would render the modification void or voidable. Furthermore, this argument was raised during the hearing (gov't br. at 59), and we rejected it. The government is not permitted to reargue this position in a motion for reconsideration.

3

*"McMullen presumption"*

The government also attacks the legal basis for relying upon the time extension in Mod. P00009 by arguing Gaskins was obligated to prove liability, causation and resultant injury for any alleged compensable delay, and should not have been allowed to simply rely on the time extension in Mod. P00009. Consequently, our decision was in error because it relied upon the presumption that the grant of the time extension in the Mod. established the contract was in fact extended by that amount. This presumption, the government argues, incorrectly relies upon the *"McMullen presumption"* which was specifically overruled by *England v. Smoot Corp.*, 388 F.3d 844, 856-57 (Fed. Cir. 2004). The government asserts that the grant of a time extension in Mod. P00009 cannot provide a legal basis for us to conclude the project was actually delayed 50 calendar days or that the government was responsible for such delay.

The government's reliance upon *England v. Smoot* is misplaced. That decision holds that there is no presumption of government fault where the contracting officer issues an interim (unilateral) decision regarding the extent of a government-caused delay. The basis for this ruling is grounded in the fact the Contract Disputes Act, 41 U.S.C. § 7104(b)(4), mandates we are not bound by a contracting officer's final decision and the same principal applies to interim decisions on government fault for delays. *Smoot*, 388 F.3d at 856-57. Here, Mod. P00009 was a bilateral agreement that recognized the contract was delayed 50 calendar days (5 October 2010 thru 24 November 2010) as a result of the government's inaction (finding 102). Although questioning whether there was in fact a basis for recognizing a 50-day delay, Mr. Heckman, the government's delay expert, based his analysis in his report upon a finding that there was a binding contractual agreement of 50 days of delay that was the responsibility of the government based upon the parties' agreement (R4, tab 39(a) at 14, table; finding 103). Consequently, we did not decide this issue on the basis of a presumption but rather recognized that the parties contractually agreed there was a 50-day delay caused by the government and it extended the contract period.

*Mr. Heckman's Analysis*

The government asserts our statement that Mr. Heckman did not analyze this issue is in error (gov't mot. at 2-4). We stand corrected, Mr. Heckman's supplemental report states, "After the 'delayed' approval, DACA waited more than 4 months to add additional containments. Thus the approval was not critical, and DACA did not lose an opportunity to double their productivity due to the delayed approval period." (R4, tab 39(b) at 3) Therefore, we read Mr. Heckman's opinion to be that DACA (Gaskins) was not damaged by the delay in approval, a critical element to support a compensable delay. *BAE Systems San Francisco Ship Repair*, 16-1 BCA ¶ 36,404 at 177,503; *Lear Siegler*, 12-2 BCA ¶ 35,112 at 172,425.

4

In reviewing Mr. Heckman's supplemental report, we note that we failed to recognize evidence that casts doubt on Mr. Lowe's opinion, i.e., that the government's delay in approval prevented DACA (Gaskins) from doubling its productivity during the delay (5 October 2010 thru 24 November 2010).

*Mr. Lowe's Conclusion that Productivity would have Doubled*

Gaskins' only showing of damages resulting from the government's delay in approval was Mr. Lowe's testimony (Gaskins' delay expert) that Gaskins would have been able to double its productivity if approval had been timely (*see* finding 103). The government argues we erred because the evidence does not support Mr. Lowe's conclusions, stating:

> Mr. Lowe concluded half of the 50-day time extension in P00009 is compensable based on a "theoretical" doubling of productivity he felt Gaskins might have experienced if the Navy's approval to add containments had come earlier. He did not perform any productivity analysis of Gaskins or its subcontractors to support this conclusion. Tr. 4/61-68. [Exhibit 8]. As noted, Mr. Lowe's report does not indicate he evaluated any contractor delays or inefficiencies, including DACA's December 7, 2010 assertion that welding delays (not a lack of approval to add containments) caused it to experience a "*significant loss in overall productivity.*"

(Gov't mot. at 5)

We agree Mr. Lowe's conclusions were not based upon any formal evaluation of Gaskins' or its subcontractor's productivity. Instead, his testimony demonstrates his opinion was based upon the logic that if two more containments were added to the existing two it would have doubled productivity. (Finding 103; tr. 4/62-68) That logic might apply in most cases but not all. In fact, on further review, it is doubtful it would apply under these facts. On further review, it is doubtful additional containments would have increased productivity, rather it is highly likely they would have contributed to more delays. The evidence establishes that the process of repairing defective welds by Gaskins' welding subcontractor and the re-inspection, rather than the government, hindered DACA's progress during this period. DACA's notice of claim to Gaskins in its 7 December 2010 letter solely blamed the welding subcontractor for its "significant loss in overall productivity" explaining:

5

> Due to the welding rework required by your [Gaskins']
> Welding Subcontractor, DACA has incurred delays in
> completing their work on Trusses 1 through 6 and has been
> required to redo already completed areas of work on all
> 6 trusses. The start then stop then start, work then rework, then
> rework again nature of the welding repairs has also caused
> DACA a significant loss in overall productivity.

(Findings 74-75; app. supp. R4, tab 27) The government argues DACA had difficulty making progress during the fall with two containments and there is no evidence to conclude additional containments would solved DACA's problems (gov't mot. at 8). On reconsideration, we find it is more likely that adding two additional containments during this time frame would probably double the disruption to DACA's work productivity rather than increase it. The government also argues this conclusion is supported by the fact that no additional containments were added shortly after approval but instead not until four or five months later (*id.* (citing R4, tab 39(b) at 3)). On reconsideration, we agree. Consequently, we reconsider our decision on this issue and modify our decision to hold that Gaskins has failed to meet its burden of proof that it was damaged by the delay in approval and, consequently is not entitled to any compensation for this delay.

*Mr. Lowe's Failure to Consider Concurrent Delay*

The government also asserts that Mr. Lowe's opinion did not consider possible concurrent delays on the part of the contractor (gov't mot. at 2-4). To prove compensable delay, Gaskins must prove that any government-caused delays were not concurrent with delays within Gaskins' control. *Versar*, 12-1 BCA ¶ 35,025 at 172,128. Our findings establish there was concurrent delay throughout this period caused by Gaskins' welding contractor, Garrison Steel, based upon Mr. Heckman's revised report finding there was concurrent delay from September 2010 through the end of the project in 2011 (finding 100), as well as other contemporaneous evidence that Gaskins' welding subcontractor delayed DACA's progress during this period (findings 74-75). Gaskins did not address such concurrent delay and there is no evidence that Mr. Lowe considered concurrent delay in his analysis and resulting opinion on this issue. Without such evidence, Gaskins cannot recover monetary compensation on this portion of its claim. (*Id.*) Consequently, we reconsider our decision on this issue and modify our decision to hold that Gaskins is not entitled to compensation for this concurrent delay.

6

2. Requests for Clarification on Board's Ruling on Gaskins' Entitlement to 48 Days of Excusable Delay Related to the Steel Profile Issue: Mod. P00003

The government asks us for clarification in our decision that Gaskins is entitled to 48 days of excusable delay related to the Steel Profile issue, referencing our finding of fact 101, stating:

> We have searched the decision to try to understand the basis for this ruling and for an explanation as to where on the calendar the board places these 48 days. Determining when these 48 days occurred would allow for confirmation that they were actually on the critical path, that they are not days on which the contractor delayed the project, and that they are not days for which a time extension was already granted. From the wording in the board's decision dealing with this issue, the Navy has been unable to make these determinations. We ask that the board reconsider its finding(s) on this issue.

(Gov't mot. at 16)

Our decision was based upon Mr. Lowe's testimony per his report and our analysis of the contemporaneous evidence referenced within that report. Our analysis is described in detail within our findings (findings 94-99).

3. Board's Ruling on Additional Costs for Work Covered in Mod. P00003: The Steel Profile Issue

The government asserts two issues related to this part of our decision. First, it seeks clarification on the statement in our decision that "Gaskins is entitled to the proven reasonable incurred cost of additional work that was not included in the amount reimbursed by Mod. P00003" (gov't mot. at 16-17). Despite our statement in the opening paragraph of our opinion that we would address entitlement only, the Navy asks whether this was a statement on quantum. Clearly, it was not. In addition to our statement that we would address entitlement only, in the last paragraph of the opinion we expressly stated that we were remanding to the parties for negotiation of quantum. 17-1 BCA ¶ 36,780 at 179,265, 179,294.

Second, the government's motion asserts we erred, stating:

> [W]e do not believe the question of entitlement to
> additional costs for the new work covered under P00003 is
> exclusively a matter of quantum because the nature of the
> claimed additional damages and the question of whether
> they were incurred was at issue in this entitlement
> proceeding. Because we believe these aspects of the claim
> were *not* proved, we ask that the board reconsider its
> finding on this issue.

(Gov't mot. at 18)

Our findings establish that the government agreed there was a differing site condition and that Gaskins was entitled to the costs of the additional work and additional time and costs for associated delays. The only point of disagreement was the amount of additional time and cost resulting from the associated delay (finding 35). After negotiations, the government issued a notice to proceed, and stated a modification would be forthcoming. The government agreed with the costs submitted by Gaskins for the new work but not the costs and time associated with the delays and, as a result, it stated the modification would include 34 working days until the associated delay and costs could be negotiated. Mod. P00003's stated purpose, in part was to, "compensate the contractor for delays associated with this unforeseen condition" and included money as compensation for associated delays. (Findings 35-36) The only dispute at this point is the amount which will be addressed during quantum.

We reaffirm our decision and deny the government's motion on this issue.

4.    Board's Ruling on Gaskins' Entitlement to Additional Personal Protective Equipment (PPE) Costs

The government asks that we reconsider our decision on a portion of Gaskins' PPE claim involving the government's delay in providing DLA-approved containers. Specifically, the government asserts there is no evidence in the record establishing that the government delayed Gaskins by its inability to provide DLA containers, nor when the delay occurred, or why it necessitated hiring additional workers. (Gov't mot. at 19-20)

Regarding whether the government delayed Gaskins by its failure to provide the DLA containers and when any such delay occurred, our findings establish that: the contracting officer (CO) ordered Gaskins to dispose of all hazardous waste through the Mayport HWSF on 17 February 2011 (finding 59); the government informed Gaskins it must use DLA-approved containers but then informed Gaskins on 14 March 2011 that

8

the Mayport HWSF could not provide the DLA containers or accept third-party containers (R4, tab 254; finding 73). Additionally, DACA began demobilizing from the site on 20 May 2011 and was completely demobilized by 31 May 2011 (finding 80). In sum, we found that the government was unable to provide the DLA containers in a timely manner between 14 March 2011 and 20 May 2011.

Regarding the need to hire additional workers, our findings established Mr. Frost (Gaskins) testified that DACA increased its as-bid 9 workers to–at times –up to 20 workers. This, Mr. Frost testified, was necessitated by the delay resulting from the CO's order to submit another sampling plan and the inefficiencies in using the DLA provided containers. (Tr. 3/97-99; *see* finding 61) Gaskins alleged, and Mr. Frost's and Mr. Wright's testimony identified, two discrete delays related to the order to use only DLA approved containers: (1) the alleged inefficiencies resulting from the transfer of blast debris at the job site from the original containers to the DLA containers for disposal; and (2) the transfer of blast debris from the original containers for temporary storage necessitated by the government's delay in providing the approved containers (findings 61, 73).

The Board found that the government was not responsible for delays resulting from the CO's order to submit another sampling plan. 17-1 BCA ¶ 36,780 at 179,290. Likewise, we found that the requirement to transfer spent debris from the third-party containers to DLA-approved containers was not a change to the contract and, as a result, any inefficiencies that might have resulted from collecting the blast debris in the original containers at the work site and then transferring the hazardous spent debris to DLA containers for disposal was not the fault of the government. However, we did find that Gaskins was entitled to compensation for hiring and equipping additional workers as a result of the inefficiencies from transferring spent debris to other containers for temporary storage to keep the work progressing while waiting for DLA containers. 17-1 BCA ¶ 36,780 at 179,289.

Regarding the disposal and repurchase of PPE gear, Mr. Mingle (DACA) testified that the discovery of hazardous waste in the spent debris required DACA to dispose of PPE as a hazardous waste and continually purchase new PPE (finding 61). The government did not present any evidence to contradict Mr. Mingle's testimony on this issue. Entitlement would also apply to any additional workers hired to transfer waste for temporary storage as a result of the government's delay in providing DLA containers.

Our decision concluded that Gaskins was entitled to reasonable, actual damages incurred as a result of: (a) the cost of disposing of the PPE as a hazardous waste and

9

purchasing replacement PPE for the original nine workers;[2] and, (b) the cost of outfitting any additional workers with PPE incurred in transferring the debris to/from temporary containers because of the government's delay in providing DLA containers in a timely manner.[3]  17-1 BCA ¶ 36,780 at 179,289-90.

We reaffirm our decision and deny the government's motion on this issue.

5.      Board's Findings of a Differing Site Condition Related to the Discovery of Hazardous Waste

Simply put, the government argues there was no differing site condition because the RFP disclosed the presence of hazardous materials in the paint; and because the total metal test results provided to the offerors disclosed the presence of chromium and lead in the existing coatings any reasonable industrial painting contractor should have been alerted to the risk that hazardous waste might be generated in the spent blast debris as the paint coating was removed. (Gov't br. at 78-84; gov't reply br. at 3)  This argument was repeatedly made during the litigation, we considered it and, based upon the facts of this appeal, rejected it.  We found that the discovery of hazardous levels of chromium in the spent blast debris differed materially from the conditions disclosed in the RFP related to the risk of encountering hazardous waste.  17-1 BCA ¶ 36,780 at 179,286.

The government argues we erred in failing to recognize the distinction between "hazardous paint" and "hazardous waste" and inappropriately conflated the two concepts in our decision (gov't mot. at 21).  Contrary to the government's argument, we did recognize the difference but found the government's arguments lacking.  17-1 BCA ¶ 36,780 at 179,286, 179,294 n.16.  We found both parties used the terms incorrectly and interchangeably throughout the appeal but found it did not impact our decision.  Id.[4]  The government focuses only upon the disclosure of the test results (presence of hazardous materials in the existing paint) but ignores that we found a differing site condition related to the existence of unexpected levels of hazardous waste in the spent debris contrary to representations made by the government during the source selection.  This issue turned upon the conditions communicated to the offerors during the source selection concerning

---

[2]  The nine original workers were impacted as a result of the discovery that spent blast debris was unexpectedly classified as hazardous waste (differing site condition).

[3]  The cost of additional worker PPE was caused by the government's inability to provide DLA containers in a timely fashion necessitating the temporary transfer to other containers until DLA containers could be acquired.

[4]  In fact the paragraph quoted in support of our conflating these concepts paraphrases language in the solicitation (attachment B.2) where the government conflates the two concepts (gov't mot. at 21).  17-1 BCA ¶ 36,780 at 179,286 (paraphrasing a quote in finding 7).

the possible risk of the existence/generation of hazardous waste after award. 17-1 BCA ¶ 36,780 at 179,286-87. Yet the government continues to ignore that the solicitation provided the offerors with the test results but then went on to indicate, in effect, that the job should be priced assuming the waste generated would be non-hazardous waste.

The government urges us to consider the testimony of Mr. Pilley, one of the industrial subcontractors who bid on the job, and our decision in *South Bay Boiler Repair, Inc.,* ASBCA No. 59281, 17-1 BCA ¶ 36,634 (gov't resp. at 6-7). We have considered both and conclude they do not support the government's argument, but rather, support appellant's argument and our decision.

The government relies upon the following specific segment of Mr. Pilley's testimony to support its argument:

> As one of the industrial painting subcontractors who bid the job (Mr. Mike Pilley) testified when asked if he thought the solicitation directed bidders to assume that the existing coatings were *non-hazardous:* "the RFP, second one, directed us to price it as if it was a hazardous coating." [He then clarified that by "second one," he meant an amendment to the RFP.] Tr. 6/21-22.

(Gov't resp. at 6 n.4) Although the government accurately quotes this particular segment of Mr. Pilley's testimony, its use in isolation misrepresents Mr. Pilley's testimony on this issue. He, in fact, testified that he distinguished between the risk of higher worker protection costs that might result if the existing coatings were hazardous (the paint before blasting), and the risk of hazardous waste generation in the spent blast debris. He further testified that he read the solicitation to be a non-hazardous disposal (waste) job so he priced his bid on the assumption any waste generated would be non-hazardous. (Tr. 6/28-30)

The decision in *South Bay Boiler* involved our interpretation of 10 U.S.C. § 7311, *Repair or maintenance of naval vessels: handling of hazardous waste,* that specifically requires the Navy to disclose the types and amounts of hazardous waste that are expected to be generated or removed during performance in each contract for work on a naval vessel. We found this statute imposes a duty on the government to identify the type and quantity of hazardous waste that is expected to be generated. The statute at issue in *South Bay,* and thus the government's duty to disclose estimated potential hazardous waste after award, does not apply to the contract at issue in this appeal because it is not a contract for repair or maintenance of a naval vessel. However, that statute and the *South Bay* decision illustrate the dilemma faced by offerors bidding on this contract in trying to weigh the risk of encountering

11

hazardous waste disposal cost. Unlike the facts in *South Bay*, the government here communicated to the offerors, as Mr. Pilley testified, that this was a non-hazardous waste job, i.e., that it did not include any cost for hazardous waste disposal.

Taking a different tack, the government argues, "[i]n concluding that there was a differing site condition, the board incorrectly compared TCLP results of *waste* obtained by Gaskins after award with TCLP results for *paint* in the solicitation" (gov't resp. at 6). We disagree. Our findings established, and Gaskins eventually conceded, that the solicitation did disclose test results indicating the presence of hazardous metals in the existing paint coating (finding 7; app. br. at 42). But again, the government ignores the fact that our decision was based upon the direction provided the offerors during the source selection related to the risk of hazardous waste after award. 17-1 BCA ¶ 36,780 at 179,286-87.

Additionally, the government asserts there is no evidence in the record of actual pre-bid reliance on the TCLP results in the RFP because of statements made in Gaskins' claim and complaint (gov't mot. at 23). Again, the government ignores the fact that the issue of reliance (differing site condition) was related to the government's representations regarding the risk of hazardous waste being generated. Gaskins' claim, after reciting what it perceived as RFP representations that this was a non-hazardous job, specifically states, "Gaskins reasonably interpreted these repeated references to 'non-hazardous debris' as consistent with the RFP's specific instruction to bid the debris removal as non-hazardous." (R4, tab 36 at 1112) Additionally, the government inexplicably ignores the fact Gaskins specifically enquired during the source selection about the presence of hazardous materials based upon its reading of the test results, which the government chose not to answer. Gaskins' question and the internal government discussion about the question clearly indicate Gaskins' reliance upon the test results to determine the risk of encountering hazardous waste in the spent debris. (Findings 9-13) 17-1 BCA ¶ 36,780 at 179,286.

We reaffirm our decision and deny the government's motion on this issue.

6.    Ruling Denying the Government's Claim for Liquidated Damages

Given our findings that Gaskins is entitled to 48 additional days of excusable delay related to Mod. P00003, the government cannot support its claim for liquidated damages based upon 32 days of delay to the contract completion date. Consequently, the government's motion for reconsideration on this issue is denied.

<u>CONCLUSION</u>

We deny the government's motion, except as to our modification of our decision on entitlement to 25 days of compensable delay related to the multiple containment request resulting in Mod. P00009.

Dated: 14 February 2018

JOHN J. THRASHER
Administrative Judge
Chairman
Armed Services Board
of Contract Appeals

I <u>concur</u>

RICHARD SHACKLEFORD
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I <u>concur</u>

MICHAEL N. O'CONNELL
Administrative Judge
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA Nos. 58550, 59901, 59902, Appeals of L.C. Gaskins Construction Co., Inc., rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals

13